IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WHITE CAP CONSTRUCTION SUPPLY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TIGHTON FASTENER AND SUPPLY CORPORATION d/b/a Tighton Tools & Fasteners, Inc.; MATT UPDIKE; MIKE NENEMAN; RICH WHITE; GREG ASCHE; JASON JARZYNKA; and BILL SHUMAKER, | ) ) ) ) ) ) ) ) | 8:08CV264<br><br>ORDER DENYING MOTIONS TO DISQUALIFY PLAINTIFF'S COUNSEL |
| Defendants. | ) | |

This matter is before the court on defendants' motions (Filings 154 & 160) to disqualify plaintiff's counsel. The court has reviewed and considered the entire court file, particularly the evidentiary materials of record in Filings 107, 157, 162, 168 and 179.

The court finds that the motions should be denied.

I. BACKGROUND

A.   Nature of the Dispute

Plaintiff ("White Cap") and defendant, Tighton Fastener and Supply Corporation ("Tighton"), are business competitors. Tighton wished to expand its business into the sale of construction materials. Between January 28, 2008 and March 3, 2008, the majority of White Cap's Nebraska sales force (including individual defendants Updike, Neneman, Asche, Jarzynka, Shumaker and White) left White Cap and went to work for Tighton. White Cap's

sales force at its Store 101 was reduced from 11 salespersons to 3 salespersons within an eight-week period.

The individual defendants were account managers for White Cap and had access to White Cap's established customer base. They and three other sales employees were solicited and hired by Tighton. Invoking this court's diversity jurisdiction, *see* 28 U.S.C. § 1332, White Cap initially asserted the following state law claims:

- Unfair Competition (against Tighton & Updike)
- Breach of Employment Contracts (against all Individual Defendants)
- Tortious Interference with White Cap's Employee Relationships (against all defendants)
- Tortious Interference with White Cap's Employee Agreements (against Tighton)
- Tortious Interference with White Cap's Customer Relationships or Expectations (against all defendants)
- Civil Conspiracy (against all defendants)
- Aiding and Abetting (against all defendants)

The state law claims are stayed as to the individual defendants, pending White Cap's review of discovery and assessment of whether a separate arbitration proceeding is necessary. The claims against Tighton are not stayed.

During discovery, White Cap learned that, in February 2008, individual defendant Matt Updike had obtained a private call-in code for a telephone conference call between White Cap and its attorneys and used the code to secretly access a confidential telephone call during which White Cap's litigation strategy was discussed. At that time, Updike was working for Tighton and was no longer working for White Cap. On January 5, 2010, White Cap sought leave to amend its complaint, offering in support of its motion an affidavit (Filing 107-1) dated August 13, 2009 and signed by individual defendant Rich White. White Cap's motion was granted on March 26, 2010, and White Cap was granted leave to add an eighth

cause of action against Tighton and Updike for "intercepted communications" under the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*.

Updike and Tighton filed answers denying liability under the Federal Wiretap Act. Tighton also asserted a cross-claim for "indemnity, contribution, or other legal claim" against individual defendant Rich White ("White"), alleging that "any attempt to use an electronic or other device to deliberately listen to a claimed confidential communication ... was, upon knowledge and belief, undertaken by [White] and not by [Updike]," without the knowledge or consent of Tighton. White, who is now proceeding without the assistance of counsel, denies Tighton's allegations.

**B.   Legal Representation of Individual Defendant Rich White**

On July 15, 2008, attorneys David J. Koukol and Karisa D. Johnson entered appearances (*see* Filings 14-19) on behalf of each individual defendant, including Rich White. Tighton was paying the defense costs. The fee agreement for this arrangement is not of record.[1]

According to Mr. Koukol (Filing 157-6), the meetings at which Rich White was in attendance or communications that Koukol had to which Rich White was a party were:

   a. July 10, 2008, conference at Tighton Tools (other clients in attendance

---

[1] Under the Nebraska Code of Professional Responsibility,
   (f)  A lawyer shall not accept compensation for representing a client from one other than the client unless:
      (1) the client gives informed consent;
      (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
      (3) information relating to representation of a client is protected as required by Rule 1.6.
Neb. Ct. R. of Prof. Cond. § 3-501.8. The rule recognizes that lawyers are often asked to represent a client "under circumstances in which a third person will compensate the lawyer, in whole or in part." *Id.*, Comment 11.

included Matt Updike, Mike Neneman, Jason Jarzynka, Bill Shumaker, Greg Ashe) regarding the case filed by Plaintiff, fact gathering, and strategy for defense.

    b. September 27, 2008, email communication to Rich White and other clients.

    c. October 2, 2008, phone conference (other clients also participated) regarding issues related to Plaintiffs complaint and strategy for seeking arbitration.

    d. November 11, 2008, phone conference (other clients also participated) regarding strategy, issues and response to Plaintiffs settlement demand.

    e. December 15, 2008, email communication to Rich White and other clients regarding input on proposed settlement offer terms.

    f. December 23, 2008, phone conference (other clients were also in attendance) regarding settlement, strategy and options.

    g. February 7, 2009, email communication with copies of recent court filings and analysis of strategy and advice as to recommended action.

    h. February 25, 2009, email communication outlining impact of court's order on pending motions on clients' cases.

Rich White resigned from Tighton Tools in March 2009 over a dispute involving the chargebacks that Tighton was taking from White's commissions.[2] (Filing 157-5). On March 19, 2009, Mr. Koukol was told of White's resignation from Tighton. (Filing 157-6).

Rich White states in his affidavit that he did not hear from Mr. Koukol between the time of his resignation in March 2009 and June 3, 2009, when he opened a letter from Koukol. (Filing 168-3). Koukol's letter, dated June 2, 2009, announced that Tighton would no longer be paying White's defense costs in this action and stated, "If you want me to continue representing you, we will need to sign a new fee agreement that discloses your [sic] have left Tighton." (Filing 168-3, quoting White's affidavit). Koukol enclosed a billing invoice including time spent in April 2009 reportedly "involving a reference to settlement

---

[2] Defendant Updike is Tighton Tools' Sales Manager.

negotiations or strategy." (Filing 157-6).[3] After receiving Koukol's letter and invoice, White called Updike, who responded, "You can't expect us to pay for your lawyer, you don't work here anymore." White told Updike that he could just call White Cap's lawyers and see if they would drop the lawsuit against him. Updike reportedly replied, "That's fine. Do what you gotta do."

Rich White states that, after receiving the June 2, 2009 letter and talking to Updike, he assumed that his contract with Mr. Koukol was no longer valid and he would have to contact Koukol and sign a new agreement if he wanted continuing representation. White decided not to sign a new agreement and not to seek further representation from Mr. Koukol. (Filing 168-3).

Rich White states that he called Koukol on June 19, 2009 to find out how much his total bill was. Koukol asked why he wanted to know. White indicated he would like to settle his bill since he would not be signing a new agreement with Koukol and did not want Koukol to represent him. According to White, Koukol told White to "hold on" on that decision. White said he thought he was already not represented when he received Koukol's June 2, 2010 letter. Koukol's last bill to White was for May 2009 in the amount of $43.33. White paid Koukol in full for March, April and May 2009 in the total amount of $90.15. White was not billed by Koukol for any services rendered after May 2009. (Filing 168-3).

Koukol admits that, on June 19, 2009, at approximately 2:05 p.m., he received a phone call from Rich White wherein White advised Koukol that he no longer wanted Koukol to represent him. Koukol states that he advised White of the procedures for him to withdraw as counsel. (Filing 157-6).

Mr. Koukol did not file any motion for leave to withdraw until September 2, 2009. The motion (Filing 80) stated that "White has advised Koukol that he is in the process of securing new counsel." The motion to withdraw was heard and granted on September 28, 2010. White advised the court, without reservation, that he did not want to retain new

---

[3] The letter and invoice were not offered by any party for the court's review.

counsel in this case and he would represent himself. The matters of Koukol's June 2, 2009 letter and the June 19, 2009 telephone conversation between White and Koukol were not mentioned during the hearing. (*See* Filing 85, Audio File). Mr. Koukol observed White leaving the September 28, 2009 hearing with plaintiff's attorney, Gillian O'Hara. (*See* Filing 157-6 at ¶ 9).

### C. The Contacts Between Rich White and Plaintiff's Counsel

On June 4, 2009, Rich White initiated contact with plaintiff's counsel, Gillian O'Hara, by leaving a voicemail message to the effect that he was no longer employed by Tighton, and Tighton was "no longer putting [him] under the umbrella to pay for lawyers." The contact was unsolicited. (Filings 107-1, 168-1 & 168-3).

Filings 168-1 and 168-3 indicate that Gillian O'Hara returned White's call on June 9, 2009. At that time, she asked White whether he was represented by counsel and told him she could not talk to him if he was represented by an attorney. White told O'Hara he was not, because of Koukol's June 2, 2009 letter. White states that the letter led him to believe he was not under a valid contract with Koukol. White offered plaintiff's counsel his full cooperation and a truthful personal account of the events at issue in this lawsuit in exchange for White Cap's agreement not to pursue White in the pending lawsuit or any future arbitration. (Filing 107-1).

On June 11, 2009, Gillian O'Hara contacted Rich White to arrange a meeting. She and co-counsel, Marcia A. Washkuhn, met with White on June 16, 2010 at the offices of Kutak Rock. According to Ms. O'Hara, White, for the first time, discussed his factual knowledge related to this case. At the outset of the June 16 meeting, White confirmed that he was not represented by counsel, and he presented the details regarding the contents of Koukol's June 2, 2009 letter. Ms. Washkuhn discussed the attorney-client privilege with Mr. White in O'Hara's presence, and explained to him that White Cap did not want any such privileged information from him. O'Hara states that she did not seek privileged information from White during the July 16 meeting or at any other time.

Ms. Washkuhn states that she had not spoken to Rich White prior to the June 19, 2009 meeting. She did not attend the entire meeting but was present at the beginning. White personally relayed in detail the circumstances of how he came to be unrepresented. He also disclosed the contents of the June 2, 2009 letter he had received from David Koukol regarding those circumstances. White voluntarily presented the letter, without the enclosures referenced therein. White left the meeting with the letter, and they did not make a copy of it. White presented no other documents pertaining to communications between him and his attorney. Washkuhn states that she also discussed the attorney-client privilege with White and told him that White Cap did not want to obtain any such privileged information from him. Washkuhn specifically advised White not to reveal any information that would have been relayed to an attorney, from him to an attorney or revealed in front of him in the presence of an attorney. Other than the information White voluntarily disclosed on June 16, 2009, pertaining to the contents of Koukol's June 2, 2009 letter, Ms. Washkuhn has received no such information from Rich White. (Filing 168-2).

Rich White confirmed in his affidavit, Filing 168-3, that attorneys O'Hara and Washkuhn told him they did not want any information about Tighton's or Updike's strategies, settlements or offers. They did not want to know anything that White previously discussed with his former attorney. They reviewed and discussed Koukol's June 2, 2009 letter.

Gillian O'Hara met with White multiple times between June 16, 2009 and August 13, 2009 regarding his knowledge of the facts and events at issue in this lawsuit. The affidavit executed by Rich White on August 13, 2009[4] contains essentially all of the information White shared at the June 16, 2009 meeting. (Filing 107-1).

On June 26, 2009, White signed a "Settlement Agreement and Covenant Not to Sue" (Filing 157-2) in which White Cap agreed it would not sue White in any future legal proceeding or arbitration based on the facts or claims raised in this lawsuit. In return, Rich White promised his voluntary, truthful and complete cooperation with White Cap in this

---

[4] The affidavit (Filing 107-1) was filed on January 5, 2010 in support of White Cap's Motion for leave to file its First Amended Complaint adding the claims against Updike and Tighton under the Federal Wiretap Act.

lawsuit and/or arbitration. White agreed, among other things, to "answer fully, completely, honestly and in good faith all questions asked of him" and to provide a statement under oath regarding "the facts, events, circumstances, conversations, identities of persons and other information relevant to the Lawsuit or Arbitration." The document was signed by White Cap's representative on July 2, 2009.

White Cap's Amended Complaint adding the claim under the Federal Wiretap Act was served on March 30, 2010. (*See* Filings 134 & 136). Updike and Tighton filed their answers on April 30, 2010 and May 5, 2010, respectively.

By affidavit (Filing 168-1), White Cap's attorney, Gillian O'Hara, advises that Mr. Koukol called her on May 26, 2010 and requested that White Cap dismiss its wiretapping claim against Updike. In exchange, Koukol offered to refrain from filing a "motion to exclude" O'Hara's firm, Kutak Rock, as counsel for White Cap on the grounds that O'Hara and co-counsel Marcia Washkuhn allegedly were "witnesses" to the "wiretapping event" because they were present on the telephone call with White Cap representatives at the time the call was intercepted. O'Hara told Koukol that White Cap would not dismiss the wiretapping claim.

Updike and Tighton filed the pending motions on June 24, 2010 and July 2, 2010, respectively, accusing plaintiff's attorneys of professional misconduct because of their contacts with Rich White.

## LEGAL ANALYSIS

"'"Because of the potential for abuse by opposing counsel, "disqualification motions should be subjected to particularly strict scrutiny."'" *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) (quoting *Harker v. Comm'r*, 82 F.3d 806, 808 (8th Cir. 1996)). "Although the moving party must satisfy a high standard of proof to sustain a disqualification motion, any legitimate doubts, which are created by the movant's proffer, must be resolved in favor of disqualification." *Olson v. Snap Prods., Inc.*, 183 F.R.D. 539, 542 (D. Minn. 1998).

A party has the right to choose its own legal counsel, and "'the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary.'" *Macheca Transp. Co.*, 463 F.3d at 833. Thus, motions to disqualify counsel are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law. *In re Kennedy*, 2008 WL 1052039 (Bankr. D. Neb. Apr. 8, 2008) (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)); *Steele v. Lacey*, 1997 WL 138974 at *1, 4:CV96-3342 (D. Neb. Mar. 26, 1997). As Magistrate Judge Piester observed in *Board of Regents of the Univ. of Neb. v. BASF Corp.*, 2006 WL 2385363 at *5, Case No. 4:04-cv-03356 (D. Neb. Aug. 17, 2006), the District of Nebraska

> has specifically not incorporated any particular code or ethical rules of professional conduct. Instead, the applicable local rule establishes as a general rule that an attorney admitted to practice must not engage in "conduct unbecoming of a member of the bar." NEGenR 1.7(b)(2)(B). The rule permits the court to consult others' rules or codes of professional conduct if it would be helpful in resolving issues before it. *Id*.

Although doubts should be resolved in favor of disqualification, the party arguing for disqualification bears the burden of demonstrating clearly that continuing representation would be impermissible. *Engineered Prods. Co. v. Donaldson Co., Inc.*, 290 F. Supp. 2d 974, 980 (N.D. Iowa 2003); *A.J. by L.B. v. Kierst*, 56 F.3d 849, 859 (8th Cir. 1995).

Here, defendants Matt Updike[5] and Tighton Tools insist that the plaintiff's attorneys must be disqualified due to their allegedly "egregious" *ex parte* "interrogation" of Rich White, "in patent violation of Rule 4.2[6] of the Model Rules of Professional Conduct." (Filing

---

[5] Although they are also represented by Updike's attorneys, the rest of the Individual Defendants have not joined in Updike's motion to disqualify plaintiff's counsel.

[6] The Nebraska Rules of Professional Conduct, *see* http://court.nol.org/rules/pdf/Ch3Art5.pdf, were recodified effective July 18, 2008 and

> placed in the Nebraska Court Rules at Chapter 3, Attorneys and the Practice of Law, Article 5, Nebraska Rules of Professional Conduct. Section numbers have replaced the Chapter and Article numbers, but retain the 1.0 through 8.5 numbering system used in the original rule. Rule 1.0 thus becomes Neb. Ct. R. of Prof. Cond. § 3-501.0, and Rule 8.5 thus becomes § 3-508.5. References within the rule remain unchanged so, for example, the reader may

156 at p. 1).

>Nebraska's Rule 4.2 provides:
>
>In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Neb. Ct. R. of Prof. Cond. § 3-504.2.[7]

This rule applies to people who are represented by counsel. *Id.*, Comment [2]. Thus, the essential preliminary issue is whether Rich White was, in fact, represented by counsel when he communicated with plaintiff's attorneys. The court finds he was not.

Based on the information of record, the court concurs with plaintiff's assessment that effective June 2, 2009, Mr. Koukol expressly conditioned his representation of Rich White on three events: (1) White choosing to continue with Koukol as his lawyer; and (2) White's willingness to pay Koukol to represent him; and (3) White's agreement with and willingness to sign the new contract Koukol required to continue the representation. (*See* Filing 167, Plaintiff's Brief at p. 4).

---

   interpret a reference to Rule 2.3 and find it at Neb. Ct. R. of Prof. Cond. § 3-502.3. Main divisions and subdivisions in the original rule remain as before.
Neb. Ct. R. of Prof. Cond. Ch. 3, art. 5 (Revisor's note).

   [7]In its motion, Tighton Tools joins in Updike's arguments and further complains that plaintiff's counsel should have asked for its permission to interview Rich White because Tighton is White's former employer and liability for his actions could "potentially" be imputed to Tighton. Rule 4.2 does prohibit communications with a constituent of a represented organization if the constituent's act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. However, "[c]onsent of the organization's lawyer is not required for communication with a former constituent." Neb. Ct. R. of Prof. Cond. § 3-504.2, Comment 7. It appears to the court that there is scant "potential" that Tighton could be held vicariously liable for White's actions, considering the claims that were actually pled. In any event, Rich White has never been represented in this matter by counsel for Tighton Tools, and there is no evidence suggesting that White somehow participated in the planning of Tighton's defense.

Mr. Koukol's law firm had been retained in 2008, apparently by defendant Tighton Tools, to represent all six of the individual defendants in this case. The state law claims against the individual defendants have been stayed since February 25, 2009 (Filing 53). Koukol knew of White's resignation from Tighton Tools as early as March 19, 2009, and Koukol's affidavit (Filing 157-6) does not mention any significant contact with Rich White after February 2009 (although the record reflects that Koukol did bill White for services performed in March, April and May 2009).

Rich White attests that he did not hear from Mr. Koukol between the time of his resignation in March 2009 and June 3, 2009, when he opened Koukol's letter enclosing a billing invoice and announcing that Tighton would no longer be paying White's defense costs. According to White, Koukol's letter asked if he wanted Koukol's continuing representation and advised: "If you want me to continue representing you, we will need to sign a new fee agreement that discloses your [sic] have left Tighton." (Filing 168-3, quoting White's affidavit). The June 2, 2009 letter has not been offered for the court's review; however, the defendants/movants do not dispute White's description of its content. When defendant Updike verified that Tighton would no longer be paying White's legal fees, White told Updike of his intention to cooperate with White Cap's lawyers. According to White, Updike replied, "That's fine. Do what you gotta do."

Mr. Updike personally became aware on or about June 3, 2009 of Rich White's intention to independently negotiate with the plaintiff. Perhaps Updike did not timely share this information with his attorneys. In any event, Mr. Koukol was certainly aware as of the afternoon of June 19, 2009 that White had chosen not to continue with Koukol as his lawyer, was unwilling to pay Koukol to represent him, and would not sign the new contract Koukol required to continue the representation. The relationship between attorney and client is "usually terminable at will or governed by contract." *Gordon v. Community First State Bank*, 255 Neb. 637, 654, 587 N.W.2d 343 (1998); *see generally* Charles W. Wolfram, *Modern Legal Ethics* § 9.2.1 (1986). Indeed, under the Nebraska Rules of Professional Conduct, "A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services." Neb. Ct. R. of Prof. Cond. § 3-501.16, Comment 4; *see also* 1 Restatement (Third) of the Law Governing Lawyers § 32(1) (2000); *Scudder v. Haug*, 201 Neb. 107, 110, 266 N.W.2d 232, 235 (1978).

Nor did Koukol's delay in filing a motion for leave to withdraw serve to extend the duration of his representation of Mr. White. *See, e.g., In re Users System Servs., Inc.*, 22 S.W.3d 331, 334-35 (Tex. 1999) (the client's right to terminate the relationship is not limited by the attorney's responsibilities to a court as counsel of record for the client). "The client's freedom to discharge the lawyer at any time would be nugatory unless the lawyer were required to withdraw." Wolfram, *supra* at § 9.5.4.

Turning to defendants' arguments that plaintiff's attorneys should have consulted defense counsel before speaking to Mr. White,

> Rule 4.02 does not require an attorney to contact a person's former attorney to confirm the person's statement that representation has been terminated before communicating with the person. Confirmation may be necessary in some circumstances before an attorney can determine whether a person is no longer represented, but it is not required by Rule 4.02 in every situation, and for good reason. The attorney may not be able to provide confirmation if, as in this case, he and his client have not communicated. And while a client should certainly be expected to communicate with his attorney about discontinuing representation, the client in some circumstances may have reasons for not doing so immediately. Frazier [the client], for example, may not have wanted his co-defendants to know of his decision to meet with Landreth and Gulde [opposing counsel] for fear that they might try to dissuade or deter him. But whether he had a good reason or not, Frazier was not required to tell Cannan [the former attorney] that their relationship was terminated before Gulde could meet with Frazier without violating Rule 4.02. A client can discharge an attorney at any time, with or without cause. Of course, a client's delay in telling his attorney that his representation has terminated may have other consequences. The client may be liable for work the lawyer continues to do for him, not realizing that his services have been terminated. The client may also be bound by the attorney's actions done in the good faith belief that he continued to represent the client.

*In re Users System Servs., Inc.*, 22 S.W.3d at 334-35.

The most reasonable inference that can be drawn is that Mr. Koukol, in a sense, "fired" White as a client by way of the June 2, 2009 letter. After receiving Koukol's

communication, and verifying with defendant Updike that Tighton was no longer paying his legal fees, White reasonably concluded that he was no longer represented by Mr. Koukol. White determined that he did not want to be represented by Mr. Koukol in the future and, on or about June 3, 2009, announced to Updike his intention of cooperating with the plaintiff.

Rich White then contacted Gillian O'Hara on his own volition. The more reasonable interpretation of White's June 4, 2009 telephone message was that White was no longer represented by counsel. In any event, before they talked to Rich White, O'Hara and Washkuhn took reasonable steps to verify that White was, in fact, no longer represented. For example, when she returned White's telephone call, O'Hara asked White whether he was represented by counsel and told him she could not talk to him if he was represented by an attorney. At the outset of the June 16, 2010 meeting between Rich White and plaintiff's counsel, White once again confirmed that he was no longer represented by counsel and presented the details of Koukol's June 2, 2009 letter. White relayed in detail the circumstances of how he came to be unrepresented. Ms. Washkuhn discussed the attorney-client privilege with Mr. White, explaining to him that White Cap did not want any such privileged information from him.

There is no evidence that Rich White revealed any privileged information to plaintiff's attorneys. The court questions whether White even had any "privileged" information to reveal, considering the nature of defense counsel's joint representation of White, Updike, and the other individual defendants. "When a lawyer represents multiple clients in a common matter, it is understood that one risk the lawyer must disclose to the parties before accepting the representation involves the joint client exception to the attorney-client privilege." Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics - The Lawyer's Deskbook On Professional Responsibility* § 1.6–9 (2010-11 ed.)

Matters of privilege are governed by Rule 501 of the Federal Rules of Evidence, which provides, "[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." *Blackledge v. Martin K. Eby Const. Co., Inc.*, 542 F.2d 474, 476 n.1 (8th Cir. 1976) ("Privileges created by state law are, of course, applicable in a diversity action.").

Most of the parties' claims and defenses are governed by Nebraska law. Under Nebraska law, there is no lawyer-client privilege "as to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in any action between any of the clients." Neb. R. Evid. 503(4)(e), Neb. Rev. Stat. § 27-503(4)(e). As to the claims raised in the Amended Complaint under the Federal Wiretap Act, matters of privilege are governed "by the principles of the common law as interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. The federal courts have relied upon Proposed Federal Rule of Evidence 503, also known as Supreme Court Standard 503, as an accurate definition of the federal common law of attorney-client privilege. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915-16 (8th Cir.), *cert. denied*, 521 U.S. 1105 (1997). The language of Supreme Court Standard 503(d)(5), 56 F.R.D. 183, 237 (July 1, 1973) is identical to that of Nebraska Evidence Rule 503(4)(e).

Knowing–since early June 2009–of the widening divergence of Rich White's legal interests from his own, and of White's intention to contact opposing counsel, defendant Updike took no action to protect his allegedly privileged information until June 24, 2010, when he filed the motion to disqualify his opponent's attorneys.[8] To prevent the use of a motion to disqualify counsel as a strategic device, the court must consider the timing of the motion. *Civco Med. Instruments Co., Inc. v. Protek Med. Prods., Inc.*, 2004 WL 1326474 at *3, No. 4:03-cv-40722 (S.D. Iowa June 4, 2004) (citing *Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978)). "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Central Milk*, 573 F.2d at 992. The timing and circumstances under which Updike and Tighton filed these motions suggest that the defendants are far more interested in dislodging plaintiff's attorneys than in protecting any legitimately privileged or confidential information.

---

[8] The details of White's cooperation with the plaintiff were formally disclosed to all parties on January 5, 2010 with the filing of White's August 13, 2009 affidavit (Filing 107-1) in support of plaintiff's motion for leave to add the Federal Wiretap Act claims against Updike and Tighton.

The court finds that Rich White was not represented by counsel after June 2, 2009. After performing a reasonable inquiry prior to speaking with White, plaintiff's attorneys had no reason to believe that White was represented by counsel or employed by Tighton Tools at that time. Under the circumstances, plaintiff's counsel had no duty–or reason–to consult, notify or seek permission from defense counsel before interviewing Mr. White. The record does not support the defendants' complaints that plaintiff's attorneys violated Rule 4.2 or any other ethical rule in their contacts with Rich White.

## ORDER

**IT IS ORDERED** that defendants' motions (Filings 154 & 160) to disqualify plaintiff's counsel are denied.

A party may object to a magistrate judge's order by filing an "Objection to Magistrate Judge's Order" within 14 days after being served with the order. The objecting party must comply with all requirements of NECivR 72.2.

**DATED August 16, 2010.**

                                                **BY THE COURT:**

                                                s/ F.A. Gossett
                                                **United States Magistrate Judge**